# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ANDREW BROWN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-596-GMS |
| | ) | |
| PERRY PHELPS, Warden, and | ) | |
| ATTORNEY GENERAL OF | ) | |
| THE STATE OF DELAWARE, | ) | |
| | ) | |
| Respondents. | ) | |

---

Andrew Brown. *Pro se* petitioner.

James T. Wakley, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.  Counsel for Respondents.

---

## MEMORANDUM OPINION

_____, 2011

Wilmington, Delaware

**Sleet, Chief Judge**

Pending before the court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. §

2254 filed by petitioner Andrew Brown ("Brown"). (D.I.2) For the reasons discussed, the court

will deny the petition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Steven Cleveland was shot and killed in Wilmington in March 2005. *Brown v. State*, 947

A.2d 1062, 1064 (Del. 2007). On the night of the shooting, Steven and Dion Gibbs walked back

to Steven's house after visiting some friends. When they turned the corner at Corkwood Street,

three men attacked Steven and Dion. One of the attackers held a gun to Dion's head and

rummaged through his clothing, looking for valuables. The attacker demanded that Dion remove

his clothes, and ordered him to run away, leaving Steven behind. As Dion ran away, he heard

gun shots. The attacker shot Steven four times. Steven died from massive internal bleeding. *Id.*

at 1064-65.

The Wilmington Police ("WPD") investigated the homicide. They eventually determined

that Andrew Brown killed Steven. A grand jury indicted Brown on two counts of first degree

murder and eight other related charges. However, the police could not find Brown. *Id.*

The search for Brown continued for several months. Eventually, a joint task force of

Federal Marshals and the New York Police Department ("NYPD") found and arrested seventeen

year old Brown in Brooklyn, New York. After the officers arrested Brown, they contacted the

WPD, and the chief investigating officer the case, Detective Donna DiClemente, went to New

York. *Id.*

Detective DiClemente and Detective Bower, also a Wilmington police officer,

1

interrogated Brown at the police station in Brooklyn without any involvement from, and outside the presence of, the NYPD officers. After the WPD interrogation, Brown made an incriminating statement to the two NYPD officers[1] who were transporting him from the interrogation to the central booking sation in New York. Brown told the officers:

> She [DiClemente] stated that the reason I shot Steven Cleveland was because he wouldn't do what I wanted him to do. She doesn't know what she is talking about. That's not why I shot him. If you were there and looked at his body, you would have seen he was doing exactly what I wanted him to do, taking off his clothes, as you can see his pants were down to his knees when they found him. I shot him because he wasn't doing it fast enough.

*Id.*

A Delaware Superior Court jury convicted Brown on two counts of first degree murder, two counts of first degree robbery, four counts of possession of a deadly weapon during the commission of a felony, and second degree conspiracy. Brown was sentenced to life imprisonment. Brown appealed, and the Delaware Supreme Court affirmed in part and remanded in part. *Brown*, 947 A.2d at 1073. After remand, the Delaware Supreme Court affirmed the Superior Court's rulings. *Brown v. State*, 947 A.2d 1120 (Table), 2008 WL 1953517 (Del. Apr. 23, 2008)

## II. GOVERNING LEGAL PRINCIPLES

### A. The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206

---

[1]One of the transport officers was a federal marshal, and the other was an officer with the NYPD. For ease of reference, the court will refer to both officers as NYPD officers.

(2003)(internal citations and quotation marks omitted).  Pursuant to AEDPA, a federal court may

consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

AEDPA imposes procedural requirements and standards for analyzing the merits of a habeas

petition in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are

given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002);  *see*

*Woodford,* 538 U.S. at 206.

### B.  Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the

petitioner has exhausted all means of available relief under state law.  28 U.S.C. § 2254(b);

*O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999);  *Picard v. Connor*, 404 U.S. 270, 275

(1971).  AEDPA states, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to
> the judgment of a State court shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or
>     (ii) circumstances exist that render such process ineffective to protect the rights of the
>     applicant.

28 U.S.C. § 2254(b)(1).

The exhaustion requirement is based on principles of comity, requiring a petitioner to

give "state courts one full opportunity to resolve any constitutional issues by invoking one

complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at

844-45; *Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).  A petitioner satisfies the

3

exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the

state's highest court, either on direct appeal or in a post-conviction proceeding. *See Lambert v.*

*Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997); *Coverdale v. Snyder*, 2000 WL 1897290, at *2 (D.

Del. Dec. 22, 2000). "Fair presentation of a claim means that the petitioner must present a

federal claim's factual and legal substance to the state courts in a manner that puts them on notice

that a federal claim is being asserted." *Holloway v. Horn*, 355 F.3d 707, 714 (3d Cir. 2004).

### C. Standard of Review Under AEDPA

If a federal court determines that a claim is not procedurally defaulted and the state court

adjudicated the federal claim on the merits, the court can only grant habeas relief if the state

court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250

F.3d 203, 210 (3d Cir. 2001). A claim has been "adjudicated on the merits" for the purposes of

28 U.S.C. § 2254(d) if the state court decision finally resolves the claim on the basis of its

substance, rather than on a procedural or some other ground. *Thomas v. Horn*, 570 F.3d 105, 115

(3d Cir. 2009).

When reviewing a § 2254 petition, a federal court must presume the state court's

determinations of factual issues are correct, unless the petitioner presents clear and convincing

evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 341

(2003)(stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues,

4

whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions). This presumption of correctness applies to both explicit and implicit findings of fact. *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000).

## III. DISCUSSION

Brown asserts four grounds for relief in his petition: (1) the trial court erred by admitting the confession he made to the NYPD officers while in the transport car; (2) the state courts erred in concluding that the statements of two witnesses were admissible at trial under Del. Code Ann. tit. 11, § 3507; (3) the State violated it obligations under *Brady v. Maryland*, 373 U.S. 83, 87 91963), *Jencks v. United States*, 353 U.S. 657 (1957), and *United States v. Bagley*, 473 U.S. 667, 676 (1985), by negligently failing to disclose a transcript of a conversation between Ruth Ann Clark and a police officer until four days after her testimony had concluded, thereby depriving him of a fair trial; and (4) the Delaware Supreme Court erred in affirming his convictions. The court will review the claims in seriatim.

### A. Claim One: Admitting Brown's Statement to the NYPD Violated his Fifth and Sixth Amendment Rights

At trial, the State conceded that Brown's June 28, 2005 statement to Detective DiClemente was inadmissible under the Sixth Amendment because it was obtained after Brown's April 18, 2005 indictment. (D.I. 19 at 5)  The State, however, moved to admit Brown's subsequent statement to the NYPD officers while he was in the transport car on the grounds that it was spontaneously and voluntarily made. Brown moved to suppress the statement as "fruit of the poisonous tree," the poisonous tree being Detective DiClemente's earlier interrogation at the NYPD station. The trial judge ruled that Brown's statement to the NYPD officers should not be suppressed as "fruit of the poisonous tree," because neither NYPD officer said anything during

5

transport which resulted in the statement made by the defendant. In other words, Brown's statement was truly unsolicited. *Id.* at 5-6.

On appeal, the Delaware Supreme Court determined that the trial court's bench ruling focused solely on a Fifth Amendment analysis, because the judge only considered whether Brown made the statement in response to a police interrogation. After concluding that insufficient evidence had been adduced at trial to support the trial court's conclusion under a Sixth Amendment analysis, the Delaware Supreme Court remanded the case back to the trial court for additional factfinding. *Brown*, 947 A.2d at 1065, 1071-72. Specifically, the Delaware Supreme Court instructed the trial court to view the issue under Sixth Amendment jurisprudence and consider whether Brown invoked his right to counsel at any point and whether any actions by Detective DiClemente "were deliberately designed to elicit Brown's [later] incriminating remarks." *Id.* at 1071.

On remand, the Superior Court found that when Brown "chose to invoke his right to remain silent," "the WPD immediately and properly honored [his] choice each time by stopping the interrogation." *Brown v. State*, 2008 WL 1969653, at *8 (Del. Super. Ct. Apr. 7, 2008). The Superior Court further found that "[t]he testimony at the hearing on remand confirms that Brown made an unsolicited, spontaneous utterance to the NYPD officers, which was the product of free and deliberate choice." *Id.* Finally, the Superior Court found that "DiClemente did not use a purposefully coercive tactic intended to elicit [the statement to the NYPD officers] from Brown." *Id.* The Delaware Supreme Court affirmed the rulings of the Superior Court. *Brown v. State*, 2008 WL 1953517, at *1.

Now, in claim one, Brown contends that the Delaware courts violated his "Fifth, Sixth,

6

and Fourteenth Amendment rights" in admitting the incriminatory statement he made to the

NYPD officers during transport.  According to Brown, the incriminatory statement to the NYPD

officers was "fruit of the poisonous tree," with the poisonous tree being his statement to

Detective DiClemente.  In other words, Brown argues that his statement to the NYPD officers

should have been suppressed as tainted because it flowed from the earlier deprivation of his Fifth

and Sixth Amendment rights that occurred during the WPD interrogation.  Given the Delaware

Supreme Court's adjudication of this claim on the merits, the court must review the instant

argument under § 2254(d).

When evidence obtained in violation of a defendant's Fourth, Fifth, or Sixth Amendment

rights leads to the discovery of additional evidence, that additional evidence is often referred to

as the "fruit of poisonous tree" and may need to be suppressed in order to protect the defendant's

constitutional rights.  *See Nix v. Williams*, 467 U.S. 431, 442 (1984)(noting that fruit of

poisonous tree doctrine applies to the Fifth and Sixth Amendments as well as to the Fourth

Amendment).  However, this exclusionary doctrine bars evidence that has been illegally obtained

only if the "fruit" is sufficiently connected to the "poisonous tree."  According to the Supreme

Court,

> [w]e need not hold that all evidence is "fruit of the poisonous tree" simply because it
> would not have come to light but for the illegal actions of the police.  Rather, the more
> apt question in such a case is "whether, granting establishment of the primary illegality,
> the evidence to which instant objection is made has been come at by exploitation of that
> illegality or instead by means sufficiently distinguishable to be purged of the primary
> taint.

*Wong Sun*, 371 U.S. 471, 487-88 (1963).  The court will address Brown's Fifth Amendment and

Sixth Amendment claims *in seriatim*.

7

### 1. Fifth Amendment Argument

Brown contends that his unsolicited statement to the NYPD officers while in the transport car should have been excluded as "fruit of the poisonous tree" because he was in custody and had invoked his Fifth Amendment right against self-incrimination during his interrogation by Detective DiClemente. Brown also contends his Fifth Amendment rights were violated because he was under the age of eighteen at the time of the interrogation and the police did not make any effort to contact his parents.

Pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), statements made by a defendant during a custodial interrogation must be suppressed unless he was provided certain warnings and waived his rights. A defendant's waiver of *Miranda* rights is valid if it is made "voluntarily, knowingly, and intelligently." *Id.* at 475. The Supreme Court has identified two distinct components for determining if a defendant has waived his *Miranda* rights. *See Moran v. Turbine*, 475 U.S. 412 (1986). First, the relinquishment of the right must be voluntary in the sense that it was the product of a free and deliberate choice rather than the result of intimidation, coercion, or deception. Second, the waiver must be made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id.* Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension, may a court properly conclude that *Miranda* rights have been waived. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

The "term interrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response

from the subject." *Id.* at 301. Significantly, spontaneous statements that were not made in response to interrogation or its functional equivalent are not barred by *Miranda. Rhode Island v. Innis*, 446 U.S. 291, 299-301 (1980).

Additionally, although determining the voluntariness of a juvenile's confession requires "special scrutiny," age alone does not render a confession involuntary. *See Fare*, 442 U.S. at 725; *In re Gault*, 387 U.S. 1, 45 (1967); *Haley v. Ohio*, 332 U.S. 596, 599 (1948). A juvenile defendant's custodial confession can be admissible even if the police officers did not adhere to the parent-notification procedures of the juvenile code, provided that the confession was made voluntarily and was not the result of police coercion. *See Fare*, 442 U.S. at 726. Factors to consider in determining the voluntariness of a juvenile's confession include the juvenile's experience with the police, the length of interrogation, and whether the juvenile was questioned by trickery or deceit. *Id.* at 726-27.

When applying the "fruit of the poisonous tree" doctrine in the context of a sequential confession and possible *Miranda* violation, the admissibility of a subsequent statement "turns solely on whether [it was] knowingly and voluntarily made." *Fellers v. United States*, 540 U.S. 519, 524 (2004).

> [C]larity is served if the later confession is approached by asking whether in the circumstances the *Miranda* warnings given could reasonably be found effective. If yes, a court can take up the standard issues of voluntary waiver and voluntary statement; if no, the subsequent statement is inadmissible for want of adequate *Miranda* warnings, because the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning.

*Missouri v. Seibert*, 542 U.S. 600, 612 n. 4 (2004). "As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Oregon v. Elstad*, 470 U.S. 298,

317 (1985).

To begin, the Delaware state courts' decisions are not contrary to clearly established
Federal law because the courts applied the aforementioned applicable precedent. *See Fahy v.
Horn*, 516 F.3d 169, 196 (3d Cir. 2008) (Supreme Court of Pennsylvania's decision was not
"contrary to" clearly established Federal law because the court appropriately relied on its own
state court cases, which articulated the proper standard derived from Supreme Court precedent);
*Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal
rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably
within § 2254(d)(1)'s 'contrary to' clause").

After reviewing the record in this case within the aforementioned framework, the court
also concludes that the Delaware state courts' rejection of Brown's *Miranda*/Fifth Amendment/
"fruit of the poisonous tree" claim did not involve an unreasonable application of United States
Supreme Court precedent.  Turning first to the issue of Brown's juvenile status, the trial judge on
remand noted that Brown was seventeen years old without the presence of his parents at the time
of the interrogation.  Analyzing the interrogation with "special scrutiny," the judge noted
Brown's significant experience with the criminal justice system, explaining that

> [a]t the time of the interrogation, Brown had been arrested numerous times, beginning at
> age ten.  Criminal charges include: assault, terroristic threatening, offensive touching,
> disorderly conduct, aggravated menacing, criminal mischief, assault in a detention
> facility, possession of a deadly weapon during the commission of a felony, burglary,
> hindering prosecution, and resisting arrest.  The *Miranda* rights were read to him
> numerous times.  Brown had been represented by several attorneys prior to the Cleveland
> homicide.  Brown had been involved in countless court proceedings . . .

*Brown*, 2008 WL 1969653, at *6.

In turn, the record reveals that the WPD officers repeatedly read Brown his *Miranda*

10

rights during their interrogation, and that Brown understood those rights. Brown never asked for an attorney. As found by the Superior Court on remand, the WPD officers observed Brown's invocation of his Fifth Amendment rights every time he invoked his right to remain silent during the initial interrogation. When Brown finally stated he was done talking, the WPD officers ceased their interrogation. As found on remand, Detective DiClemente did not make a final accusation and then abruptly end the interrogation. Rather, Brown had an opportunity to answer all of the detective's questions; he just chose to invoke his right to remain silent and end the interrogation. Brown was then removed from the building and placed in a police car for transport. Although, as the trial judge recognized, the time that elapsed between the termination of Detective DiClemente's interrogation and Brown's spontaneous statement was brief (5 to 10 minutes), in that time Brown had been taken from the station house and out of the presence of Detective DiClemente. In fact, when Brown made his statement, he was not in the presence of any WPD officer and he was in the custody of another jurisdiction. The NYPD officers to whom Brown made the statement had no knowledge of the Delaware investigation; neither officer said anything to Brown to provoke him to speak; and neither did or said anything to exploit any illegality from the WPD officers' interrogation of Brown.

Viewing the totality of the circumstances surrounding both the initial interrogation and the subsequent statement, the court concludes that the Delaware Supreme Court's determination that Brown's statement was spontaneous and voluntary constituted a reasonable determination of the facts, and also involved a reasonable application of Supreme Court precedent. Significantly, the interrogation by the WPD officers did not involve a violation of Brown's *Miranda* rights, and Brown clearly understood those rights. Brown's subsequent statement to the NYPD officers was

11

not made in response to interrogation or its functional equivalent, it was not coerced, and it was

not a continuation of Detective DiClemente's initial interrogation. Rather, Brown's statement to

the NYPD officers was both voluntary and spontaneous and, therefore, did not need to be

suppressed under the "fruit of the poisonous tree" doctrine. Accordingly, the court will deny this

portion of claim one for failing to satisfy § 2254(d).

### 2. Sixth Amendment Argument

Brown also contends that the trial court violated his Sixth Amendment rights by failing to

exclude his statement to the NYPD as "fruit of the poisonous tree," the "poisonous tree" being

his uncounseled interrogation by, and statement to, Detective DiClemente.

"[T]he right to counsel granted by the Sixth . . . Amendment [] means at least that a

person is entitled to the help of a lawyer at or after the time that judicial proceedings have been

initiated against him 'whether by way of formal charge, preliminary hearing, indictment,

information, or arraignment.'" *Brewer v. Williams*, 430 U.S. 387 (1977). Once the Sixth

Amendment right to counsel has attached, the government may not "deliberately elicit"

incriminating statements from the defendant without the presence of his attorney. *See United

States v. Henry*, 447 U.S. 264, 270 (1980)(outlining the "deliberate elicitation" standard);

*Massiah v. United States*, 377 U.S. 201, 206 (1964)(a defendant is denied the "basic protections

of [the Sixth Amendment] guarantee [of representation by counsel] when there was used against

him at his trial evidence of his own incriminating words, which federal agents had deliberately

elicited from him afte he had been indicted and in the absence of his counsel." ). However, "the

Sixth Amendment is not violated whenever – by luck or happenstance – the State obtains

incriminating statements from the accused after the right to counsel has attached." *Maine v.*

12

*Moulton*, 474 U.S. 159, 176 (1985). Rather, "the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Id.* The "defendant must demonstrate that the police [] took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986).

When applying the "fruit of the poisonous tree" doctrine after a defendant's Sixth Amendment right to counsel has attached, the issue is whether the government agent "deliberately elicited" the incriminating statement, regardless of whether the agent's conduct constituted "interrogation." *Fellers v. United States*, 540 U.S. 519, 524 (2004). Because direct proof of the government's knowledge will seldom be available to the accused, "proof that the State 'must have known' that its agent was likely to obtain incriminating statements from the accused in the absence of counsel suffices to establish a Sixth Amendment violation.'" *Moulton*, 474 U.S. at 176 n.12.

Here, the Delaware state courts cited *Massiah v. United States*, 377 U.S. 201 (1964) and *Fellers v. United States*, 540 U.S. 519 (2004) when setting forth the "deliberate elicitation" standard applicable to Brown's Sixth Amendment/"fruit of the poisonous tree" argument. *Brown*, 947 A.2d at 1070. Therefore, the court concludes that the Delaware Supreme Court's decision was not contrary to clearly established Federal law governing the instant argument. *See Williams*, 529 U.S. at 406.

The court also concludes that the Delaware Supreme Court's decision involved a reasonable application of Supreme Court precedent and was based on a reasonable determination of the facts presented. After the hearing on remand, the Superior Court found that "Brown

wanted to end the interrogation and the WPD officers honored his request.  There is not a

scintilla of evidence that DiClemente abruptly ended the interview with the intent to cut Brown

off" in order to elicit Brown's incriminating remarks later on.  *Brown*, 2008 WL 1969653, at *7.

The court defers to this factual finding because Brown has not provided any clear and convincing

evidence to the contrary.  In turn, during Brown's trial, the NYPD officers testified that they were

unaware of the circumstances of Brown's interrogation by the WPD officers, and that they did

nothing to encourage Brown's statement.  Brown has not demonstrated, nor has he alleged, that

the NYPD officers questioned him during the transport ride or engaged in activities that were the

functional equivalent of questioning while he was in the car.

Consequently, given the NYPD officers' lack of knowledge regarding Brown's case, the

cessation of the WPD officers' interrogation at Brown's request, the absence of any purposeful

coercive tactic by Detective DiClemente to elicit a statement from Brown, the absence of

interrogation by the NYPD officers, and the change of location that occurred prior to Brown's

statement  (i.e., police car vs. interrogation room), the court cannot conclude that the NYPD

officers or the WPD officers "must have known" that Brown would talk about the Cleveland

shooting while in the police car.  Rather, the record demonstrates that the NYPD officers merely

listened to Brown's unsolicited and spontaneous statement.  Pursuant to the aforementioned

precedent, "merely listening" to a spontaneous statement falls short of deliberately eliciting a

statement.  In short, the statement did not need to be suppressed as "fruit of the poisonous tree,"

because the spontaneous and voluntary statement was sufficiently removed from the taint of the

"illegal" interrogation by Detective DiClemente such that it broke the causal chain linking the

statement to the initial interrogation.  Accordingly, the court concludes that Delaware Supreme

Court's rejection of Brown's Sixth Amendment claim does not warrant relief under § 2254(d).

## B. Claim Two: Involuntary Witness Statements

Two witnesses for the prosecution, Ruth Ann Clark ("Ruth Ann") and JoAnn Brown ("JoAnn"), gave videotaped statements to the police regarding the Cleveland murder. In the statements, the women described how they saw Brown and his brother on the street shortly before the shooting. (D.I. 16, State's Ans. Br. in *Brown v. State*, No.485,2006, at 15) Hearing gunshots, they looked out their window and saw three black men running away, two of whom appeared to be the Brown brothers. *Id.*

Ruth Ann and JoAnn were reluctant witnesses. For example, Ruth Ann had to be brought to court on a material witness warrant and held under $10,000 bail. As for JoAnn, she stated during *voir dire* that she was not comfortable testifying and that she did not know anything. *Id.* Consequently, the State proposed to enter the videotaped statements into evidence pursuant to Del. Code Ann. tit. 11, § 3507.[2]

Brown objected to the admission of these statements on voluntariness grounds. After listening to the testimony of both witnesses on *voir dire*, the trial judge disagreed. Although the judge found Ruth Ann "most reluctant," he noted that "§ 3507 was enacted to deal with exactly this kind of statement of a reluctant witness." (D.I. 16, Appellant's App. Op. Br. in *Brown v. State*, No.485, 2006, at A-96) As for JoAnn, the judge again saw "exactly the kind of situation that § 3507 is designed to address." *Id.* at A-118. The statements were admitted into evidence,

---

[2]Section 3507 provides, in relevant part, that the "voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value." Del. Code Ann. tit. 11, § 3507(a). This rule applies "regardless of whether the witness' in-court testimony is consistent with the prior statement or not." Del. Code Ann. tit. 11, § 3507(b).

and both witnesses testified at trial.

On direct appeal, Brown contended that the police coerced the statements of Ruth Ann and JoAnn when they stated the witnesses could go to jail if they did not cooperate with the investigation. The Delaware Supreme Court rejected this argument, explaining that "Brown fails to recognize that the voluntariness inquiry rests on 'whether the behavior of the interrogators was such as to overbear the will of the defendant to resist and bring about a statement not the product of a rational intellect and free will.'" *Brown*, 947 A.2d at 1072. After noting Brown's failure to "point to any conduct by the police that limited Ruth Ann and JoAnn from exercising their 'rational intellect' and 'free will'," the Delaware Supreme Court held that the trial judge properly admitted the statements. *Id.*

In claim two, Brown contends that the Delaware courts erred in admitting the videotaped out-of-court statements of Ruth Ann Clark and JoAnn Brown as voluntary under § 3507. Brown alleges that the police obtained the videotaped statements by coercion, thereby demonstrating that the Delaware courts' § 3507 voluntariness determination was based on an unreasonable determination of facts in light of the evidence presented at trial. (D.I. 3 at 11) According to Brown, this error "was clearly prejudicial to his substantive rights as to jeopardize the fairness and integrity of the trial, and remand is required where the trial court did not make explicit findings as to the voluntariness of the witness' out of court statements." *Id.* at 14.

A federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Claims based on errors of state law are not cognizable on federal habeas review, and federal courts cannot re-examine state court determinations on state law

issues. *Estelle v. McGuire*, 502 U.S. 62, 67-8 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ; *Riley v. Taylor*, 277 F.3d 261, 310 n.8 (3d Cir. 2001). Therefore, to the extent Brown is arguing that the trial court erroneously applied Delaware law in admitting the two witness statements, he has failed to assert an issue cognizable on habeas review.

However, a liberal construction of Brown's "fairness and integrity of the trial" argument indicates that he may be alleging that his due process rights were violated by the improper admission of the two "coerced" witness statements. The record reveals that Brown did not "fairly present" this due process argument to the Delaware Supreme Court on direct appeal as a federal constitutional claim. Rather, Brown argued in state court that the trial court misinterpreted Delaware law by concluding that the statements were voluntary under § 3507. Consequently, Brown has not exhausted state remedies for claim two as presented here.

Any attempt to obtain further review of claim two in the Delaware state courts at this juncture would be barred by Rule 61(i)(1) as time barred and by Rule 61(i)(3) as procedurally defaulted. *See Bright v. Snyder*, 218 F. Supp. 2d 573, 580 (D. Del. 2002)(Rule 61(i)(3) bars further review of claims that were not presented on direct appeal). As a result, the court cannot review the merits of claim two absent a showing of cause and prejudice, or a miscarriage of justice. Brown has failed to satisfy this standard. Accordingly, the court will deny claim two as procedurally barred.

Nevertheless, during his direct appeal, Brown challenged the trial court's voluntariness decision as constituting an unreasonable determination of facts. As explained later in this opinion, the instant due process issue actually requires a two-tiered approach, with the first tier involving an inquiry into the reasonableness of the Delaware state courts' determination of facts.

17

*See infra* at 21-22. Therefore, the court will review the instant claim under § 2254(d).

The relevant background facts as are follows. During *voir dire*, Ruth Ann admitted that she walked to and from the police station on her own. Although Ruth Ann alleged that Detective Roundtree told JoAnn earlier that same day that she (Ruth Ann) would go to jail for hindering the prosecution if she did not give a statement, Ruth Ann admitted that she never spoke to Detective Roundtree herself and that Detective Roundtree was not in the room when she gave her statement to Detective DiClemente. (D.I. 16, Appellant's App. Op. Br. in *Brown v. State*, No.485, 2006, at A-90, A-91) After the judge asked Ruth Ann whether Detective Roundtree's alleged statement to JoAnn affected "whether or not the statement [she] gave was truthful," Ruth Ann replied,

> [s]omewhat.[] Because, you know, like I said, I didn't see nothing. I didn't see anything. All I did see was this guy in an Army fatigue jacket. I don't know anything about Bam Bam shooting no one. I don't know nothing about AD being there. I don't know nothing about anyone being there. I can't lie on those people. I have a conscience. I have to live. I can't do that. If I seen them do this, Your Honor, I would say it, but I didn't so I can't say it. This is why I am being held because I didn't see this. I can't say that. I have a conscience today. I never seen these people."

*Id.* at A-93. The judge asked Ruth Ann if anyone told her what to say, and she replied "no, not in so many words." *Id.* After a further colloquy with defense counsel and the prosecutor, the judge stated,

> [i]t is crystal clear on the stand [Ruth Ann] was equivocal as to the voluntariness of her statement. She repeatedly stated she went to the police station of her own free will, then she repeatedly stated that she only went because she was in fear of being prosecuted. She stated repeatedly her statement was voluntary, and then she also stated as we just discussed that she felt that there were certain things that she wanted the police officers – police officers wanted her to say.
>
> The standard, and the State must demonstrate this by a preponderance of the evidence, is whether under the totality of the circumstances, and as part of that the court must consider the mental and physical makeup of the individual being interrogated. Whether or not the investigators overbore the will of the interrogated to resist and bring [forth] a statement that was not the product of a rational intellect and a free will, without regard to the

18

truthfulness or reliability. I am putting aside truthfulness and reliability for the time being. That is something that counsel can argue. I am simply making a determination whether the behavior was such to overbear the will of the interrogated to resist and bring about the statement.

*Id.* at A-95.

Thereafter, the judge concluded

there is more than sufficient evidence to demonstrate that [Ruth Ann's] reluctance did not rise to a level of making her statement involuntary. She herself, upon questioning of the Court, did not give me any information which would demonstrate that the statement was coerced, to the extent as to make it involuntary. Her presence was certainly encouraged strongly. She was most reluctant, but 3507 was enacted to deal with exactly this kind of a reluctant witness. I have to view the totality of the circumstances, and I find that there is nothing in the conduct of the law enforcement officers which was inappropriate and which would affect the voluntary nature of the statement, even though [the witness] is clearly unstable and it looks to me like she is irrational.

*Id.* at A-96. The judge later clarified what he meant by "irrational." He described JoAnn as

raising her voice, with her speech becoming more animated. She began to cry, and was clearly

upset. She was unhappy. *Id.* Nevertheless, the judge found that a proper foundation had been

laid for a § 3507 statement. He explained that, had he found "her testimony to be irrational in the

context of insane or any of those other types of factors, [he] would not have found there had been

an appropriate foundation laid." *Id.*

Both JoAnn and Detective DiClemente testified during JoAnn's *voir dire*. After listening

to both, the judge concluded that, although Detective DiClemente "did not in any way threaten or

coerce this witness, I am going to accept as true the witness's testimony that other detectives

informed her that if she did not cooperate, she was under the possibility of being incarcerated."

*Id.* at A-118. However, the judge ruled that this possibility alone did not render the statement

involuntary, because "[a]ny witness may under law be incarcerated as a material witness and may

be prosecuted for failure to cooperate." *Id.* The trial judge also determined that any issues

19

relating to her mental state or drug intoxication were matters for the jury to consider in weighing the reliability of the witnesses' perceptions and recounting of those perceptions.

It is well-settled that, "[t]he use of coerced confessions, whether true or false, is forbidden because the method used to extract them offends constitutional principles." *Lego v. Twomey*, 404 U.S. 477, 482-85 (1972). Pursuant to Supreme Court precedent governing involuntary confessions by defendants, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). A statement is coerced, or involuntary, if the suspects' "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 88 (1991). Courts must consider the totality of the circumstances in determining if a statement was freely and voluntarily given, which includes both the characteristics of the person providing the statement and the details of the interrogation. *Id.* at 285-88. The surrounding circumstances can also include "the length of the interrogation, its location, its continuity, [and] the defendant's maturity, education, physical condition, and mental health." *See Connelly*, 479 U.S. at 167.

Federal habeas courts have an "independent obligation" to determine whether a confession was voluntary. *Miller v. Fenton*, 474 U.S. 104, 110 (1985). Consequently, while federal courts defer to state court factual findings on "subsidiary factual questions" under 28 U.S.C. § 2254(e)(1), the "ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination." *Miller*, 474 U.S. at 112; *see also Sweet v. Tennis*, 386 F. App'x 343, 345 (3d Cir. 2010).

20

Although the aforementioned Supreme Court precedent sets forth the rule for determining the voluntariness of a defendant's confession, many federal circuit courts have applied the same legal principle when determining the voluntariness of third-party statements.[3] *See Samuel v. Frank,* 525 F.3d 566, 571 (7th Cir. 2008); *United States v. Gonzales,* 164 F.3d 1285, 1291 n.2 (10th Cir. 1999); *Wilcox v. Ford,* 813 F.2d 1140 (11th Cir. 1987); *LaFrance v. Bohlinger,* 499 F.2d 29, 32-33 (1st Cir. 1974)("[M]ethods offensive when used against an accused do not magically become any less so when exerted against a defendant."); *Bradford v. Johnson,* 476 F.2d 66 (1973).  Finding this application to be a reasonable extension of Supreme Court precedent, the court concludes that the Supreme Court's totality of circumstances standard provides the governing legal principle for determining the voluntariness of a third-party statement.

To reiterate, Brown's complaint in this proceeding is that the threat of incarceration affected the two women's free will, demonstrating that the Delaware state courts erroneously concluded that Ruth Ann and JoAnn's statements were voluntary.  In turn, he asserts that the improper admission of these involuntary statements deprived him of a fair trial. Consequently, Brown's due process argument actually requires a two-tiered approach.  First, "under the AEDPA habeas standard," the court must "determine whether the state court's legal determination of voluntariness was contrary to, or an unreasonable application of, Supreme Court

---

[3]Notably, Delaware courts apply the Supreme Court's "totality of circumstances" test to determine the voluntariness of a third-party's statement as well as the voluntariness of a defendant's confession. *See Hatcher v. State,* 337 A.2d 30, 32 (Del. 1975)("While [*Lego v. Twomey,* 404 U.S. 477 (1972) and *Jackson v. Denno,* 378 U.S. 368 (1964)] dealt with the voluntariness of a defendant's out-of-court confession and not prior out-of-court statements of witnesses generally, the possibility of coercion by improper conduct is no less present in the one than the other."); *State v. Rooks,* 401 A.2d 943, 946-49 (Del. 1979).

precedent." *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002). If the court concludes that the Delaware state courts' voluntariness decision was contrary to, or an unreasonable application of, the governing Supreme Court precedent, then the court must determine if the admission of the involuntary statements violated Brown's right to due process. If, however, the court concludes that the Delaware state courts' decision was neither contrary to, nor involved an unreasonable application of, Supreme Court precedent, then it does not have to reach the due process issue posed by Brown. *See, e.g., Sperry v. McKune*, 445 F.3d 1268, 1274 (10th Cir. 2006).

In Brown's case, the Delaware state courts relied on the same totality of circumstances test articulated by the Supreme Court. Thus, the Delaware state courts' voluntariness decision was not contrary to clearly established Federal law.

The court also concludes that the Delaware state courts' decision did not involve an unreasonable application of Supreme Court precedent. The court begins its analysis by summarizing the trial judge's factual findings as follows: (1) Detective DiClemente, the actual interrogator, conducted herself appropriately during both interviews; (2) the conduct of the other law enforcement officers was appropriate; (3) although Ruth Ann and JoAnn were both reluctant witnesses whose presence was strongly encouraged, there was no evidence that their reluctance rose to such a level as to make their statements involuntary; and (4) although JoAnn appeared conflicted, at some level, she wanted to provide information. Brown has not provided any clear and convincing evidence to rebut these factual findings, and they are more than fairly supported by the record. Therefore, for the purposes of this review, the court accepts these factual findings as correct. *See Miller*, 474 U.S. at 117.

Keeping these factual findings in mind, the court's next step is to determine whether the

totality of circumstances in this case clearly weigh in favor of a finding of voluntariness, as

determined by the state courts. Significantly, in cases where the Supreme Court has found

confessions to be coerced, it has usually relied heavily upon factors such as actual violence or a

credible threat of violence, a person's inability to understand the process, isolation from those

who would provide support, and interrogation for long periods of time without respite. *See*

*Fulminante*, 499 U.S. at 285-86 (1991)(actual violence or credible threat of violence); *Mincey v.*

*Arizona*, 437 U.S. 199 (1960)(police interrogated defendant while he was in the hospital,

seriously injured, and in great pain); *Blackburn v. Alabama*, 361 U.S. 199 (1960)(insane

defendant interrogated for eight to nine hours in small room filled with police with no break and

no contact with his family or his attorney). None of these factors were present in this case.

Moreover, even if the court were to assume, as did the trial judge, that Detective

Roundtree mentioned potential incarceration as a way to convince Ruth Ann and JoAnn to go to

the police station to give their statements, the court concludes that Detective Roundtree's

assertion did not constitute the type of coercive police activity necessary to render the statements

involuntary. First, "[t]he power of government to compel persons to testify in court or before

grand juries and other governmental agencies is firmly established in Anglo-American

jurisprudence." *Kastigar v. United States*, 406 U.S. 441, 443 (1972). Second, in the Third

Circuit, "it is generally recognized that the police may use some psychological tactics in eliciting

a statement from a suspect." *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986). Although an

officer's psychological ploy "may play a part in the suspect's decision to confess," a confession

is voluntary "so long as that decision is a product of the suspect's own balancing of competing

considerations." *Id.* The relevant question is "not whether [the detective's] statements were the

23

cause of [the suspect's] confession – indeed, we assume that to be the case – but whether those statements were so manipulative or coercive that they deprived [the suspect] of his ability to make an unconstrained, autonomous decision to confess." *Id.* Third, other courts considering the issue have held that an official who encourages cooperation with the government and who informs the defendant of realistically expected penalties for non-cooperation does not offer an illegal inducement amounting to coercion. *See United States v. Mendoza*, 85 F.3d 1347, 1351 (8th Cir. 1996)(officer's single statement that accused would be arrested immediately if she did not cooperate was not so coercive as to deprive accused of her ability to make an unconstrained decision to confess); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990); *United States v. Ballard,* 586 F.2d 1060, 1063 (5th Cir. 1978); *United States v. Hernandez-Perez*, 2008 WL 4200130, at *8 (M.D. Fla. Sept. 12, 2008).

Viewing the circumstances of this case within the aforementioned framework leads the court to conclude that Detective Roundtree's single statement was not so coercive as to deprive Ruth Ann and JoAnn of their ability to make the unconstrained decision to give statements.  For instance,  Detective Roundtree's statement that the women faced potential incarceration appears to have been just one factor prompting Ruth Ann and JoAnn to physically go to the police station to provide their statements; as explained in the next part of this opinion, the record indicates that Ruth Ann actually initiated the contact leading to the women's two statements because she called the police station and stated that she had information regarding the Cleveland homicide. *See infra* at 25-28.  In turn, Brown has not alleged, and nothing in the record indicates, that potential incarceration of the two women for non-cooperation was unrealistic.  The record also reveals that Detective Roundtree only mentioned the possibility of incarceration on one occasion.  Thus, it

24

was reasonable for the trial court to conclude that Detective Roundtree's single assertion was not so coercive as to deprive Ruth Ann and JoAnn of their ability to exercise free will and rationally decide to give their statements.

Additionally, the circumstances surrounding Ruth Ann and JoAnn's statements demonstrate that the content of those statements resulted from the women's own balancing of considerations. Ruth Ann and JoAnn walked to and from the police station on their own. Ruth Ann admitted that nobody told her she had to stay at the police station while giving her statement. Ruth Ann was not handcuffed, arrested, or put in a cell. Neither Ruth Ann nor JoAnn spoke to Detective Roundtree when they were at the police station. Ruth Ann gave her statement first, while JoAnn waited in the waiting area. JoAnn was not arrested, handcuffed, or put in a cell, and she was free to leave the station while Ruth Ann was giving her statement. Thus, while both women were clearly reluctant prior to giving their statements, the trial court's conclusion that nothing happened during the course of the interrogation to overbear their will (and the Delaware Supreme Court's affirmance of that decision) was based on a reasonable determination of the facts in light of the evidence presented, and involved a reasonable application of Supreme Court precedent.

Given these conclusions, Brown's argument that the admission of the two statements violated his due process rights necessarily fails, because the admission of voluntary statements does not raise any due process concern. *See Gonzales*, 164 F.3d at 1291 n.2. Accordingly, the court will deny claim two as procedurally barred and, alternatively, for failing to satisfy the standards contained in § 2254(d).

**C. Claim Three: Deprivation of Brown's Right to a Fair Trial Due to State's Violation of *Brady, Bagley,* and *Jencks***

As previously determined, Ruth Ann was a highly reluctant state witness who claimed on the witness stand that her videotaped statement to police incriminating Brown had been made under duress. Ruth Ann contended that she made the statement only because the police threatened her with incarceration if she did not cooperate. On redirect examination, the prosecutor questioned Ruth Ann regarding a telephone call she made to the police in which she spoke to Detective James Diana and indicated that she had information regarding the Cleveland homicide. Detective Diana recorded the conversation. During Brown's trial, Ruth Ann at first denied making the call. The prosecutor then showed her a transcript of her conversation with Detective Diana, to refresh her recollection. Several days later, Detective Diana was called as a witness and questioned about his telephone conversation with Ruth Ann. In the course of his testimony, Detective Diana stated that he has a tape recorder on his desk and that when he learned that Ruth Ann's telephone call concerned a homicide, he recorded the call. (D.I. 16, State's Ans. Br. in *Brown v. State*, No.485,2006, at 17-18)

After Detective Diana finished testifying on direct, and four days after Ruth Ann's direct examination, defense counsel requested a mistrial because he had not been given a transcript of Ruth Ann's conversation with the detective. Prosecutors acknowledged the oversight but pointed out that a transcript of the telephone conversation had been identified as such and shown to Ruth Ann during her direct examination. *Id.* at 18. Specifically, the prosecutors explained,

> [w]e were under the impression that Mr. Capone already had it. We had, in fact, provided it. That's why I used it when Ms. Clark was, in fact, testifying. I even presented it to her, and nothing was mentioned by Mr. Capone like, "What are you referring to? Can I see that? Can I know what it is you guys are talking about?" So we just took it for granted the fact that he did have it.

26

(D.I. 16, Appellant's Op. Br. in *Brown v. State*, No.485,2006, at A-164).

The trial judge agreed that there was "neither willful nor reckless disregard of the State's obligation" to turn over the transcript while Ruth Ann was testifying. The judge also questioned whether any "discrepancies" between the transcript and Ruth Ann's testimony or statement were material or helpful to the defense. The trial judge found a mistrial unwarranted under the circumstances, but offered to order Ruth Ann recalled to the witness stand (the State having not yet rested) for continued examination, if the defense so desired. The defense did not so desire. *Id.* at A-164 to A-166. Rather, the defense expressed a desire to wait to decide if it wanted to call Ruth Ann during its case-in-chief. The defense also requested, and was granted, permission to ask a leading question during its cross-examination of Detective Diana. Thereafter, defense counsel asked Detective Diana if "the first thing Ruth Ann said to you, besides giving her name, was this: I need some help, I got a list of charges in the Court of Common Pleas." *Id.* at A-166 to A-167.

On direct appeal, Brown conclusorily alleged that the trial judge abused her discretion by refusing to grant a mistrial after the State's delayed disclosure and *Jenck*'s violation came to light. According to Brown, "his ability to fully and effectively cross-examine [Ruth Ann] was substantially impaired by the State's failure to provide the defense with the transcript of her interview with Officer Diana until 4 days after Ruth Ann testified." (D.I. 16, Appellant's Op. Br. in *Brown v. State*, No.485,2006, at 23-24) The Delaware Supreme Court denied Brown relief, holding that a mistrial was unwarranted because the trial court gave Brown the opportunity to recall Ruth Ann. The court further found that relief was unwarranted because "Brown offer[ed] no facts to support nor proffer[ed] any reason why this delay and the trial judge's proposed

remedy prejudiced him." *Brown*, 947 A.2d at 1073.

In this proceeding, Brown contends that the trial court erred by refusing to grant a mistrial after the prosecution inadvertently failed to provide a copy of the tape or transcript of the phone conversation between Ruth Ann Clark and Detective Diana. Specifically, Brown alleges that the delayed disclosure violated *Brady*, *Jencks*, and *Bagley*, and substantially impaired counsel's ability to effectively cross-examine Ms. Clark, thereby violating his right to due process.

As an initial matter, the court is not persuaded that Brown has exhausted state remedies for his argument that he was denied a fair trial due to the State's alleged failure to comply with *Brady* and *Bagley*.[4] Brown's argument on direct appeal only alleged that the delayed disclosure violated Delaware law and *Jencks*. Other courts faced with similar arguments have held that the *Brady/Bagley* progeny of cases have a different foundation than *Jencks*. *See Jones v. DeRobertis*, 766 F.2d 270, 273-74 (7th Cir. 1985)(collecting cases). Because Delaware court procedural rules would bar Brown from pursuing further review of his *Brady/Bagley* claim at this juncture, the court must treat the claim as procedurally defaulted. Brown has not alleged, and the court cannot discern, any cause for his failure to present this issue to the Delaware Supreme Court on direct appeal or in a post-conviction proceeding. In the absence of cause, the court will not address the issue of prejudice. Moreover, the miscarriage of justice exception to the procedural default doctrine is inapplicable because Brown has not provided new reliable evidence of his actual innocence. Accordingly, the court concludes that the portion of claim asserting a violation of *Brady* and *Bagley* is procedurally barred.

---

[4]Brown actually assertd his *Brady/Bagley* argument in claim four of his petition. The court, however, finds that it is more logical to include this argument in its consideration of claim three.

28

Nevertheless, even if the court were to view Brown's *Jencks* argument as somehow presenting his *Brady/Bagley* argument to the Delaware Supreme Court, the court concludes that the entire argument does not warrant relief under § 2254(d). Pursuant to *Brady* and *Bagley*, the prosecution's non-disclosure of impeaching and exculpatory evidence can amount to a constitutional violation if the prosecution suppresses material evidence favorable to the accused and that suppression then prejudices the accused. *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999). According to Third Circuit precedent, when the issue involves the delayed disclosure of *Brady* material, the defendant's due process right to a fair trial is not violated if the material is released at such a time as to allow the defense to use the favorable material effectively in presenting the case. *See United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983)*; see also United States v. Johnston*, 784 F.2d 416, 425 (1st Cir. 1986); *United States v. Mitchell*, 777 F.2d 248. 256 (5th Cir. 1985).

Here, Brown argues that the transcript constitutes evidence favorable to him because its earlier disclosure would have enabled defense counsel to more effectively cross-examine Ruth Ann and reveal her bias. The following argument asserted by Brown on direct appeal provides further elaboration of his instant contention:

> The transcript appeared to indicate that [Ruth Ann] called the police on April 5, 2005 to advise she had information about this case. The *quid pro quo* was this: she had some pending charges that she wanted the police back to take care of her. The transcript also appeared to indicate that any knowledge [Ruth Ann] had about this case came from conversations she had with a person named Pat Scruggs. []
> Defense counsel (afraid to create the impression that Ruth Ann Clark was scared to death of the defendant) decided against calling her back to the stand to ask her about the bias issue (i.e., needing police to intervene in her pending charges) and whether her testimony was all hearsay based on what she heard from Pat Scruggs. In other words, defense counsel decided that the moment had passed – and that moment occurred four days earlier when Ruth Ann Clark was called to the witness stand by the State.

(D.I. 16, Appellant's Op. Br. in *Brown v. State*, No.485,2006, at 22-23)

This argument, however, does not establish a viable *Brady/Bagley* claim. The primary

focus of the constitutional requirement under *Brady* and *Bagley* that evidence of exculpatory or

impeachment value be disclosed to the accused is whether that evidence potentially implicates

acquittal, not whether that evidence would aid the accused to formulate a better trial strategy.

*See Bagley*, 473 U.S. 667, 675 (1985). Even if the court were to assume that the transcript

constituted favorable *Brady* evidence, Brown has failed to demonstrate that he was prejudiced by

its delayed disclosure because he has not established a "reasonable probability" that the result of

the proceeding would have been different if the transcript had been provided earlier. *Strickler*,

527 U.S. at 280. Significantly, Brown was provided the transcript during the trial and was given

an opportunity to cross-examine Ruth Ann again. Brown, however, declined to do so.

Additionally, aside from conclusorily asserting that he was unable to effectively cross-examine

Ruth Ann, Brown has failed to show that a production of the transcript at an earlier time would

have enabled him to make better use of it.

Brown's reliance on *Jencks* fares no better. Pursuant to *Jencks*, the prosecution is

required to provide the defense with any prior written or recorded statements made by a

government witness prior to the defense's cross-examination of that witness if the statement

relates to the subject matter of the government's direct examination. The purpose of the *Jencks*

rule is to facilitate effective cross-examination. However, absent evidence of actual prejudice,

the delayed disclosure of a statement not resulting from willful avoidance or egregious

dereliction of a prosecutor's duty provides no *per se* basis to declare a mistrial. Rather, a

constitutional error occurs where the government has failed to disclose information that might

30

have been helpful in cross-examination "only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1976). Merely asserting that the defendant would have conducted cross-examination differently does not demonstrate the type of detriment suffered as a result of the delayed disclosure that is needed to satisfy this standard. *See United States v. Walsh*, 75 F.3d 1, 8 (1st Cir. 1996).

Once again, the court finds considerable significance in the fact that Brown declined the trial court's offer to cross-examine Ruth Ann after the State had provided the transcript. As aptly explained by the trial judge, recalling Ruth Ann to the witness stand was a meaningful and practical alternative. Brown made a tactical decision to not take advantage of this remedy, and he cannot reasonably claim prejudice as a result of this choice. Simply stated, Brown has not only failed to demonstrate how the delayed disclosure of the transcript impeded his ability to effectively cross-examine Ruth Ann, but he has also failed to demonstrate how he was prejudiced by trial court's suggested remedy of cross-examining Ruth Ann again.

Based on the foregoing, the court concludes that the Delaware Supreme Court's decision was neither contrary to, nor an unreasonable application of, clearly established Federal law. The court also concludes that the Delaware Supreme Court's decision was based on a reasonable determination of the facts in light of the evidence presented. Accordingly, the court will deny claim three.

### D.  Claim Four: Delaware Supreme Court Abused Its Discretion In Affirming The Superior Court's Decision On Remand

In claim four, Brown asserts conclusory allegations of wrongdoing by the Delaware Supreme Court in reviewing his arguments on appeal, without offering specific information or

31

factual support. Without more, these conclusory allegations fail to assert a basis for federal habeas relief. To the extent this claim re-asserts the issues contained in claims one, two, and three, the court has already concluded that they do not warrant habeas relief. Accordingly, the court will deny claim four in its entirety.

### E. Motion To Appoint Counsel

Brown recently filed his third motion requesting the appointment of counsel. (D.I. 27) As set forth above, the court has concluded that the claims asserted in Brown's petition do not warrant habeas relief. Therefore, Brown's motion is denied.

## IV. CERTIFICATE OF APPEALABILITY

When a district court issues a final order denying a § 2254 petition, the court must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The court concludes that Brown's petition does not warrant federal habeas relief. Reasonable jurists would not find this conclusion to be debatable. Consequently, the court declines to issue a certificate of appealability.

## V. CONCLUSION

For the reasons stated, Brown's petition for habeas relief pursuant to 28 U.S.C. § 2254 is denied without an evidentiary hearing. An appropriate order shall issue.